JOHN GOLDMARK (*pro hac vice forthcoming*)
johngoldmark@dwt.com
SANCHO ACCORSI (State Bar No. 329413)
sanchoaccorsi@dwt.com
JENNIFER YU (State Bar No. 341606)
jenniferyu@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Ave., 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Defendant
ELI LILLY AND COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE ALVAREZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELI LILLY AND COMPANY,<br><br>Defendant. | Case No. 2:26-cv-9456<br><br>**DEFENDANT'S NOTICE OF REMOVAL**<br><br>[From the Superior Court of California, County of Orange, No. 30-2026-01584904-CU-BT-CXC]<br><br>Action Filed: July 20, 2026<br>Action Removed: August 24, 2026 |

**TO THE CLERK AND TO PLAINTIFF AND HER ATTORNEYS**:

**PLEASE TAKE NOTICE** that Defendant Eli Lilly and Company ("Lilly") removes this action from the Superior Court of the State of California for the County of Orange to the United States District Court for the Central District of California. Lilly removes this action pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 based on the following:

**State Court Action**

1. On July 20, 2026, Plaintiff Stephanie Alvarez filed a putative class action in the Superior Court of the State of California in and for the County of Orange, captioned *Alvarez v. Eli Lilly and Company*, Case No. 30-2026-01584904-CU-BT-CXC ("State Court Action"). A true and correct copy of the State Court Action complaint is attached as **Exhibit A** ("Complaint").

2. On July 23, 2026, Lilly was served with a copy of the Complaint and a summons from the State Court Action. In addition to the Complaint, all other pleadings, processes, and orders received by Lilly in the State Court Action or found on the docket in the State Court Action are attached as **Exhibit B**, which includes the Proof of Service of Summons, Summons, Civil Case Cover Sheet, and a copy of the docket in the State Court Action.

3. In the Complaint, Plaintiff alleges that Lilly violated the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §§ 630 *et seq.*, by purportedly embedding third-party trackers and cookies on its LillyDirect website (the "Website"), which she alleges intercept and route users' communications to third parties. Ex. A ¶¶ 1–17. Based on these allegations, Plaintiff brings claims for: violation of (1) CIPA § 631; (2) CIPA § 632; (3) CIPA § 638.51; (4) breach of contract; and (5) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq. Id.* ¶¶ 109–59. Plaintiff seeks actual and compensatory damages, statutory damages and penalties, punitive damages,


DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., SUITE 2700
LOS ANGELES, CALIFORNIA 90071-3487
(213) 633-6800
FAX: (213) 633-6899

injunctive relief, restitution and disgorgement, attorneys' fees and costs, and interest. *Id.* at Prayer for Relief.

4. The State Court Action is removable to this Court because the Court has original jurisdiction and the Central District of California encompasses the location in which the State Court Action is pending (*i.e.*, Orange County, California). *See* 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant … to the district court of the United States for the district and division embracing the place where such an action is pending.").

**<u>This Action Is Removable Under the Class Action Fairness Act, 28 U.S.C. § 1332(d)</u>**

5. This Court has original jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"). CAFA reflects Congress's concern that "cases involving large sums of money, citizens of many different States, and issues of national concern, have been restricted to State courts even though they have national consequences." 151 Cong. Rec. S1086-01, S1103 (Feb. 8, 2005). It allows "[f]ederal court consideration of interstate cases of national importance under diversity jurisdiction." 28 U.S.C. § 1711, stat. note, subd. (b)(2). "[N]o antiremoval presumption attends cases invoking CAFA." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

6. CAFA extends federal jurisdiction over class actions where: (1) any member of the proposed class is a citizen of a state different from any defendant (*i.e.*, minimal diversity exists); (2) all proposed plaintiff classes total 100 or more members combined; (3) the amount in controversy exceeds $5,000,000; and (4) no exception to jurisdiction applies. 28 U.S.C. § 1332(d). This case satisfies each requirement.



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., SUITE 2700
LOS ANGELES, CALIFORNIA 90071-3487
(213) 633-6800
FAX: (213) 633-6899

***Minimal Diversity***

7. A putative class action is removable based on diversity jurisdiction if "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

8. Plaintiff is a citizen of California who seeks to represent a class of California citizens. Ex. A ¶¶ 18, 99.

9. Lilly is a corporation incorporated under the laws of Indiana and has its principal place of business in Indianapolis, Indiana. *Id.* ¶ 19. A corporation is a citizen of every state in which it is incorporated and of the state in which it has its principal place of business. 28 U.S.C. § 1332(c)(1). Lilly is therefore a citizen of Indiana.

10. Because Plaintiff is a citizen of a different state than Lilly, minimal diversity of citizenship exists. *See* 28 U.S.C. § 1332(d)(2)(A).

***Plaintiff's Proposed Class Exceeds 100 Members***

11. This action is a proposed "class action" under CAFA, which is defined as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).

12. To remove under CAFA, "the number of members of all proposed plaintiff classes in the aggregate" must be at least 100. 28 U.S.C. § 1332(d)(5)(B).

13. Plaintiff seeks to represent a class composed of "all citizens of California who declined consent to optional cookies and other tracking technologies via Defendant's Cookie Banner and whose information was disclosed by Defendant to Third Parties." Ex. A ¶ 99. She also alleges that Lilly, "one of the world's largest pharmaceutical companies," engages in "marketing and sale of pharmaceutical products to California residents" through the Website. *Id.* ¶ 19.

14. Given these allegations, the number of California visitors to the Website during the putative class period is plausibly over 1,000.


DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., SUITE 2700
LOS ANGELES, CALIFORNIA 90071-3487
(213) 633-6800
FAX: (213) 633-6899

***The Amount in Controversy Exceeds $5,000,000***

15. Where, as here, "plaintiff's complaint does not state the amount in controversy, the defendant's notice of removal may do so." *Dart Cherokee*, 574 U.S. at 84. To establish the amount in controversy, a notice of removal "need not contain evidentiary submissions." *Id.* Rather, "defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Id.* at 89.

16. For purposes of removal only, and without conceding that Plaintiff's claims entitle her or putative class members to any damages, remedies, or penalties whatsoever, the aggregated claims of the putative class exceed the jurisdictional minimum of $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2); *Lewis v. Verizon Commc'ns., Inc.*, 627 F.3d 395, 397 (9th Cir. 2010) (removing defendant need only show "the potential damages could exceed the jurisdictional amount"); *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019) ("The amount in controversy is … not a prospective assessment of defendant's liability," but rather "the amount in controversy reflects the *maximum* recovery the plaintiff could reasonably recover") (emphasis in original).

17. Plaintiff seeks statutory damages of $5,000 per CIPA violation, Ex. A ¶¶ 122, 128, 140, which factor into the amount in controversy. *See Jauregui v. Roadrunner Transportation Servs., Inc.*, 28 F.4th 989, 995 (9th Cir. 2022). With 1,000 class members, statutory damages alone, as alleged, exceed the jurisdictional threshold. *See Adzhikosyan v. AT&T Corp.*, 2021 WL 5982604, at *4 (C.D. Cal. Dec. 17, 2021) (amount in controversy met where CIPA statutory damages exceeded $5,000,000). Therefore, without conceding that the statutory maximum amount of damages would be the proper measure of relief for any of Plaintiff's claims, or that Plaintiff or any putative class members are entitled to any relief, it is reasonably possible that statutory damages could exceed the $5,000,000 threshold.


DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., SUITE 2700
LOS ANGELES, CALIFORNIA 90071-3487
(213) 633-6800
FAX: (213) 633-6899

18. Plaintiff also seeks punitive damages, restitution, attorneys' fees, and injunctive relief, Ex. A at Prayer for Relief, which also factor into the amount in controversy. *See Stolz v. Safeco Ins. Co. of Am.*, 798 F. App'x 52, 54 (9th Cir. 2019) (amount in controversy includes punitive damages); *Schneider v. Ford Motor Co.*, 756 F. App'x 700, 700–01 (9th Cir. 2018) (restitution); *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005) (attorneys' fees); *Corral v. Select Portfolio Servicing, Inc.*, 878 F.3d 770, 775 (9th Cir. 2017) (value of injunctive relief). Therefore, without conceding that Plaintiff's or any class member's claims warrant these forms of relief, they nonetheless further establish that Plaintiff's Complaint puts in controversy more than the $5,000,000 jurisdictional minimum.

19. In sum, based on Plaintiff's allegations and theories of recovery, the amount in controversy exceeds $5,000,000.

***Exceptions to Jurisdiction Do Not Apply***

20. "[T]he party seeking remand bears the burden to prove an exception to CAFA's jurisdiction." *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1021–22 (9th Cir. 2007). Accordingly, Lilly need not disprove the applicability of CAFA's exceptions as part of its "prima facie case for establishing minimal diversity under CAFA." *Id.* at 1023. Even so, here no exception applies.

**Lilly Satisfies the Requirements of 28 U.S.C. § 1446**

21. Lilly files this Notice of Removal within 30 days of service of the Complaint on Lilly, from which it was first ascertainable that this case was removable. *See* 28 U.S.C. § 1446(b)(2)(B).

22. Concurrently with the filing of this Notice of Removal, Lilly will give written notice to all adverse parties and will file a copy of this Notice with the clerk of the Superior Court of the State of California in and for the County of Orange. *See* 28 U.S.C. § 1446(d).



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., SUITE 2700
LOS ANGELES, CALIFORNIA 90071-3487
(213) 633-6800
FAX: (213) 633-6899

23. Lilly does not waive, and expressly preserves, all objections, defenses, and exceptions authorized by law, including those permitted pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Accordingly, Lilly removes the State Court Action to this Court.

DATED: August 24, 2026

DAVIS WRIGHT TREMAINE LLP

By: */s/ Sancho Accorsi*
Sancho Accorsi

Attorneys for Defendant
ELI LILLY AND COMPANY



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., SUITE 2700
LOS ANGELES, CALIFORNIA 90071-3487
(213) 633-6800
FAX: (213) 633-6899

# EXHIBIT A

Electronically Filed by Superior Court of California, County of Orange, 07/20/2026 01:52:12 PM.
30-2026-01584904-CU-BT-CXC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By S. Juarez, Deputy Clerk.

**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Telephone: (619) 762-1910
Facsimile: (858) 313-1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY OF ORANGE**

STEPHANIE ALVAREZ, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

ELI LILLY AND COMPANY,

Defendant.

Case No.: 30-2026-01584904-CU-BT-CXC

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Assigned for All Purposes:
Judge David A. Hoffer
Dept. CX103

Plaintiff Stephanie Alvarez, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Eli Lilly and Company ("Defendant" or "Lilly"). Plaintiff alleges the following upon personal knowledge as to her own actions and upon information as to all other matters:

## INTRODUCTION

1. This case arises from Lilly's violation of patients' privacy and breach of their trust.

2. Despite explicitly promising patients that their data will not be shared with third parties for "Advertising and Marketing," "Functional," or "Performance [or] Analytics" purposes, Lilly installs tracking technologies from Adobe (one of the "Third Parties") on its patient-facing website and allows Adobe to intercept and harvest patients' information for these purposes. Lilly purports to allow patients to opt-out of this tracking via a "Cookie Banner" that appears on its website (the "Cookie Banner"). As detailed below, the Cookie Banner specifically identifies Adobe's tracking technologies by name, promising to remove them if the patient clicks to opt out. Unfortunately for patients who place their medical data in Lilly's trust, clicking "Reject" on the Cookie Banner does not actually remove Adobe tracking technologies, as Lilly promises it will.

3. Lilly is one of the world's largest pharmaceutical companies. It operates LillyDirect, a direct-to-consumer pharmacy and telehealth platform available at www.lilly.com/lillydirect/, through which consumers may research and purchase Lilly medications and book telehealth appointments with licensed clinicians. Defendant assured patients and other website visitors that their private health information would remain confidential.

4. When a visitor first arrives at the LillyDirect website, Defendant presents the Cookie Banner at the bottom of the screen stating: "Lilly and our partners use optional cookies for analytics, personalization, and marketing. Some cookies may process health information. Accept or Reject optional cookies. See our Privacy Statement for more." The Cookie Banner offers two choices: an "Accept" button and a "Reject" button. As detailed below, clicking "Reject" does not actually remove the supposedly "optional" tracking technologies Defendant represents it will.

5. A "Manage Your Cookie Settings" cookie settings popup is available to users who click the "Cookie settings" link embedded in the website's footer. This popup organizes the "tracking technologies

and third-party cookies" on Defendant's website into four categories: a "Strictly Necessary" category, which "cannot be switched off in our systems"; and three optional categories: "Functional," "Performance [or] Analytics", and "Advertising and Marketing." Visitors may toggle each optional category on or off and click "Save Settings" to apply their preferences. Alternatively, they may opt out of all three optional categories by clicking "Reject" on the initial Cookie Banner.

6. The cookie settings popup discloses two Adobe products whose tracking technologies are present on the website: "Adobe Experience Cloud" and "Adobe Target." Both are listed under "Advertising and Marketing." No Adobe products are listed in the "Strictly Necessary" category. The cookie settings popup characterizes both Adobe Experience Cloud and Adobe Target as "a collection of integrated online marketing and web analytics products." Because Adobe tracking technologies do not appear among the Strictly Necessary Cookies that "cannot be switched off," users are led to believe that clicking "Reject" on the Cookie Banner, or toggling off the Advertising and Marketing category and clicking "Save Settings" in the cookie settings popup, will prevent Adobe's tracking technologies from being installed on their browsers. As alleged in detail below, this promise is false.

7. Defendant's Cookie Notice[1] confirms these representations, stating that "You can customize your consent preferences for cookies and other tracking technologies in the Lilly cookie consent solution. While strictly necessary cookies cannot be disabled, the cookie consent solution will record your choices for the use of performance, functional and marketing cookies that we use on our websites and will ask for consent again after one year." The Cookie Notice goes on to admit that unless the user "Reject[s]" cookies, "[o]ur marketing partners (including third parties) use cookies to deliver relevant ads to you on different websites or social media platforms that you visit. These cookies collect personal information about you, such as unique digital identifiers, which pages you visit, actions you take on our website, and how you arrived at our website, all of which may be used to create a profile about you." Again, as detailed below, the Cookie Notice is inaccurate. In fact, Defendant continues to collect this information and share it with Adobe (one of the Third Parties) regardless of the user's consent or lack thereof.

[1]Eli Lilly and Company, Cookie Notice, available at www.lillyhub.com/legal/lillyusa/cookienotice.html (last visited Mar. 2026).

8. Defendant's Privacy Statement[2] further reveals the full scope of the data at stake. The Privacy Statement acknowledges that, through cookies and tracking technologies, Defendant collects "inferences about your health derived from the activities, usage information, and location information that we collect," and categorizes this as "Sensitive Personal Information," which the Privacy Statement defines to include "Information about your health (such as medical condition(s), diagnoses, or information that could result in an inferred health status)." The Privacy Statement further discloses that Defendant shares this sensitive health data with "[d]ata brokers (limited data, such as information related to your interactions with certain health related pages on our Digital Properties)." Buried within Defendant's supplemental U.S. state privacy disclosures, Defendant makes the following admission in capitalized text: "NOTICE: We may sell your Sensitive Personal Information."

9. Contrary to the representations in its popup Cookie Banner, Defendant embeds Adobe cookies and tracking technologies on visitor's browsers even after visitors explicitly decline consent by clicking "Reject" on the Cookie Banner or by un-toggling optional categories on the cookie settings popup and clicking "Save Settings." Defendant's Cookie Banner is a misrepresentation designed to lure patients and other website visitors into a false sense of security. Even after patients decline consent, Defendant surreptitiously installs website tracking tools from Adobe—including trackers that send information to a domain associated with Adobe Experience Manager ("AEM") and an Adobe cookie called "affinity" (collectively, the "Trackers")—that track users' browsing activities, intercept their private communications with Defendant, and share the contents of those communications with Adobe.

10. Adobe's website indicates that AEM is one of several products comprising Adobe Experience Cloud ("AEC").[3] Because AEM is part of AEC, when Defendant promised to remove Trackers from "Adobe Experience Cloud" in its cookie settings popup, it should have removed Trackers from AEM. Furthermore, Adobe's documentation about the AEM product confirms that Defendant's cookie settings popup correctly categorizes AEM Trackers and cookies as "Advertising and Marketing" technologies. Adobe's AEM can be used for several purposes, including "creating personalized experiences for different

[2] Eli Lilly and Company, Privacy Notice (United States), available at privacynotice.lilly.com (last visited Mar. 2026).

[3] Adobe, "Adobe Experience Cloud products," available at https://business.adobe.com/products/adobe-experience-cloud-products.html (last visited Mar. 2026).

customer segments" and "the ability to deliver targeted experiences, regardless of where the customers choose to engage with you." [4] AEM accomplishes these purposes by tracking user's activities and communications across multiple platforms and site visits. Adobe's privacy policy for AEC confirms that the product is used primarily for marketing and advertising: "Adobe's business customers [like Defendant] use Adobe Experience Cloud to support their marketing and advertising."[5]

11. Contrary to its representations, Defendant retains trackers from AEM on its website even after users click "Reject" on the Cookie Banner or de-select "Advertising and Marketing" cookies on the cookie settings popup. Defendant harmed its customers by sharing sensitive and private health information—including the specific medications they research and purchase, and the medical conditions for which they seek telehealth treatment—with this undisclosed Third Party after Defendant explicitly promised not to do so.

12. The Third-Party Trackers installed by Defendant enable Adobe to lurk unknown in the background, silently harvesting health information the patient shares with the site even after Defendant expressly promised it would not allow this.

13. By means of the Trackers, Adobe intercepts, stores, uses, and re-sells private information gleaned from patients' interactions with the site. The information Defendant allowed Adobe to intercept includes health information that Defendant solicited from visitors who used LillyDirect to research medications, place prescription orders, or book telehealth appointments. For example, when a patient uses LillyDirect to research or order a specific medication, Defendant shares with Adobe at least: (1) a unique identifier associated with that patient, such as an affinity cookie; (2) the name of the specific drug the patient is researching or ordering (e.g., "Basaglar" or "Rezvoglar"); and (3) the pages the patient viewed and the actions the patient took on the site. When a patient additionally uses LillyDirect to book a telehealth appointment, Defendant shares with Adobe: (4) the fact that the patient booked or sought to book a telehealth appointment; and (5) the specific medical condition for which the patient seeks treatment (e.g., "obesity").

[4] Adobe, "Adobe Experience Manager," available at https://business.adobe.com/blog/basics/adobe-experience-manager-b (last visited Mar. 2026).

[5] Adobe, "Adobe Experience Cloud – Privacy Information," available at https://www.adobe.com/privacy/experience-cloud.html (last visited Mar. 2026).

14. When a patient visits the LillyDirect pharmacy pages and views or places an order for a specific medication, AEM receives the name of that medication along with a unique "affinity" cookie that links the drug information to that specific patient across browsing sessions. Similarly, when a patient navigates to the LillyDirect telehealth section and selects a condition category such as "obesity," AEM receives both the fact of the telehealth booking and the nature of the medical condition for which the patient seeks treatment.

15. By knowingly deploying these tracking technologies in violation of its own express assurances and without meaningful patient consent, Defendant violated the California Invasion of Privacy Act, Cal. Pen. Code § 630 *et seq*. ("CIPA"), and fundamental expectations of privacy inherent in California law and the California Constitution. The expectation of privacy is particularly important here, where the patients' interactions with Defendant's website involve *researching a specific medical condition, seeking medication for that condition, and seeking medical treatment for that condition*. Plaintiff brings this action to hold Defendant accountable for its unlawful wiretapping and its deceptive practices that left patients exposed—without warning, without choice, and without recourse.

16. This type of tracking and data sharing is exactly what the patients who declined consent via the Cookie Banner sought to avoid. Defendant falsely told patients it respected their privacy, and that they could avoid tracking and data sharing when they used the Defendant's website. Multiple aspects of Defendants' website, including its Cookie Banner, are designed to reassure patients that their use of Defendant's website will remain a private interaction between the patient and Defendant. Nevertheless, despite receiving notice of patients' express declination of consent, Defendant defied their express desires. Defendant thereby violated state statutes, tort duties, and breached its contractual duties and the implied covenant of good faith and fair dealing.

17. Defendant sold out patients' trust for a simple reason: money. Defendant allowed Third Parties to track patients' browsing activity in part because doing so earns Defendant money from marketing and advertising. Defendant allowed the Third Parties to track its patients' browsing activity in part because doing so enables Defendant to advertise its products more effectively on its own and other websites, thus earning sales revenue. Defendant's online advertising efforts become more effective when it allows Third Party data brokers to intercept patients' online communications and bundle this with additional information

collected while the patient browses other sites. For example, if a patient navigates to lillydirect.com to explore information or treatments related to diabetes, they might later see ads for Defendant's diabetes medication on other websites. These "retargeting" tactics are made possible because Defendant allowed the Third-Party data broker to silently observe and record what the patient did while on Defendant's website, without the patient's knowledge and in defiance of the patient's express rejection of cookies and tracking technologies.

## **THE PARTIES**

18. Stephanie Alvarez is a natural person and a citizen of the State of California, where she intends to remain. Plaintiff Alvarez resides in Orange, California, in Orange County. Plaintiff used Defendant's LillyDirect website to research and order medications. When presented with Defendant's Cookie Banner, Plaintiff declined non-strictly-necessary cookies and tracking technologies, including the "Advertising and Marketing" category that Defendant defines to include Adobe's Trackers and cookies. On information and belief, notwithstanding Plaintiff's rejection of optional cookies and tracking technologies, Defendant nevertheless caused Adobe tracking cookies to be installed on Plaintiff's device and transmitted Plaintiff's browsing activity and health information to Third-Party data recipients, including AEC.

19. Defendant Eli Lilly and Company is a pharmaceutical corporation incorporated under the laws of the State of Indiana, with its principal place of business in Indianapolis, Indiana. Defendant is one of the world's largest pharmaceutical companies and is publicly traded on the New York Stock Exchange. Defendant owns and operates LillyDirect, an online pharmacy and health services platform available at www.lilly.com/lillydirect, through which consumers may order medications, research conditions, and schedule telehealth appointments. Defendant is subject to personal jurisdiction in this Court by virtue of its systematic marketing and sale of pharmaceutical products to California residents through the LillyDirect platform and its direction of business activities throughout this State. Defendant owns and operates at least four locations in this State: two "Gateway Labs" research facilities in San Francisco and San Diego, a co-innovation AI lab in partnership with NVIDIA in San Francisco, and a commercial office in San Diego.[6]

[6] *See* https://gatewaylabs.lilly.com/locations (last accessed June 2026); https://sdbn.org/directory-7/eli-lilly/ (last accessed June 2026); https://www.drugdiscoverytrends.com/lilly-and-nvidia-unveil-1b-co-innovation-lab-in-sf/ (last accessed June 2026).

## JURISDICTION AND VENUE

20. This Court has personal jurisdiction over Defendant. Personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State, and committed tortious acts in this State.

21. The injuries, damages, and/or harm upon which this action is based, occurred, or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California. Defendant owns and operates at least four office locations in this State.

22. Plaintiff resides in this State, accessed Defendant's website while in this State, and was a resident of this state when Defendant illegally shared her sensitive medical and identifying information with Third Parties.

## COMMON FACTUAL ALLEGATIONS

### I. Defendant's Website Collects Sensitive Private Health Information from Patients.

23. Defendant is one of the world's largest pharmaceutical companies, with worldwide operations. Defendant develops and markets medications to treat a broad range of serious medical conditions, including obesity, diabetes, migraine, cancer, and others. Defendant operates LillyDirect, an online platform through which Defendant markets its medications directly to consumers and connects patients with independent healthcare providers. LillyDirect offers three primary consumer-facing services: (1) a pharmacy platform through which patients may browse, research, and order Defendant's prescription medications with free home delivery or retail pickup; (2) a condition support section providing health education about the medical conditions treated by Defendant's medications; and (3) a care-finding service that connects patients with independent telehealth and in-person healthcare providers specializing in those same conditions.

24. Defendant encourages prospective and existing patients to use its LillyDirect website at www.lilly.com/lillydirect. When a visitor first arrives on the site, a prominent image displays the message: "Your journey to better health deserves support—start to finish." A large, prominently placed button invites

the visitor to "See available medicines." The landing page also highlights the platform's pharmacy services, advertising "[f]ree delivery or pickup," "[t]ransparent pricing," and "[s]eamless integration of savings support and coordination of prior authorizations." Scrolling further, the site actively promotes its "Condition Support" section, inviting visitors to "[g]et a better understanding of a condition" and stating that "[o]ne of the healthiest actions a patient or a loved one can take is getting informed about a condition." The site then lists the specific medical conditions for which Defendant offers medications and care—including obesity, diabetes, migraine, cancer, Alzheimer's, autoimmune diseases, dermatology, and sleep apnea—each with a dedicated page and a prompt to "Explore Condition." Defendant thus designs its website to encourage patients and prospective patients to identify themselves as persons suffering from, or seeking information about, specific medical conditions.

25. Visitors who click "See available medicines" are taken to the medicines catalog at www.lilly.com/lillydirect/medicines, which advertises under the tagline "Science meets speed: FDA-approved medicines, delivered to you." The catalog presents Defendant's FDA-approved prescription medications organized by product, including: Zepbound (tirzepatide), indicated for PCOS and chronic weight management in adults with obesity or overweight with weight-related conditions; Humalog and Humulin (insulin products for diabetes); Emgality® (galcanezumab-gnlm) for migraine prevention; and Basaglar, Lyumjev, and Rezvoglar (additional insulin products for diabetes). By browsing the medicines catalog, selecting a medication, or viewing a medication's product page, a visitor communicates to Defendant's website—and, through the trackers embedded therein, to an undisclosed Third Party—that they are a person who is researching or seeking to obtain treatment for the specific medical condition that medication treats.

26. Taking Zepbound—Defendant's FDA-approved treatment for obesity and overweight—as an illustrative example: visitors who select Zepbound from the medicines catalog are taken to a dedicated product page at www.lilly.com/lillydirect/medicines/zepbound. There, the page prompts the visitor to "[s]elect device" from among injectable formats; "[s]elect strength," offering dosage options ranging from 2.5 mg to 15 mg; and "[s]elect payment option," choosing between insurance and self-pay. After making these selections, the visitor is shown a "Price estimate." Because "[p]rescription required" is listed as a prerequisite, the page prominently displays a "Looking for a provider?" prompt with two options for

visitors who lack a prescription: "[c]hoose a local doctor who is right for you with Healthgrades, an independent physician search tool," or "[f]ind quick and convenient care with a knowledgeable, supportive, specialized, and independent virtual care team." By presenting the medication alongside an embedded pathway to obtain a prescription from a specialist, and labeling that pathway with condition-specific language, Defendant's website design actively communicates—to any Tracker embedded in the page—that the visitor is a person seeking treatment for obesity, even before the visitor has placed an order or booked an appointment.

27. Defendant also maintains a dedicated care-finding section of its website at www.lilly.com/find-care, where visitors are greeted with the message: "We can help you find care" and "[d]octors ready to see you, wherever you are." The page instructs visitors to "[c]onnect in person or online" and to "[v]iew your options by selecting a condition below." The site then presents a tabbed interface organized by the following medical conditions: Alopecia, Dermatology, Diabetes, Eczema, Memory & Thinking, Migraine, Obesity, Psoriasis, and Sleep Apnea. When a visitor selects a condition tab, the page displays tailored "[i]ndependent telehealth options" and "[i]ndependent in-person care options" specific to that condition, together with links to initiate care. By requiring visitors to select their medical condition before they can view any care options, Defendant's website design ensures that the act of browsing for care necessarily communicates the visitor's medical condition to the site, and to the Third Party whose Trackers lurk undisclosed on the site.

28. A visitor who selects "Obesity" and clicks "Get support" for virtual care is directed to www.lilly.com/find-care/telehealth/obesity, where Defendant states that it "has carefully selected a variety of independent virtual care options for comprehensive obesity management" and that "[p]roviders can also prescribe medication, if appropriate"—including Defendant's own Zepbound. The page lists independent telehealth providers—including Form Health and 9amHealth—each with a "Connect with [Provider]" link that redirects the visitor to the provider's Third-Party platform to initiate care. A parallel flow exists for diabetes at www.lilly.com/find-care/telehealth/diabetes, where visitors are invited to connect with providers such as HealthTap for "[s]upport for Type 1 and Type 2 diabetes." In all cases, by directing the visitor through a condition-specific telehealth flow and requiring the visitor to select their condition to

access any care options, Defendant's design ensures that the visitor's medical condition is communicated to the site and to any Third-Party Trackers embedded within it at each step of the process.

29. Thus, the LillyDirect website encourages patients and prospective patients to communicate sensitive and private health information, including: (i) the specific prescription medication they are researching or seeking to order, and the medical condition or conditions treated by that medication; (ii) the dosage strength they select; (iii) whether they have a prescription or need to obtain one from a specialist; (iv) the specific medical condition for which they are seeking independent telehealth or in-person care; and (v) the identity of the independent care provider with whom they seek to connect. Defendant's website is designed so that each of these disclosures is an ordinary and expected part of the user's experience—the website actively prompts, guides, and encourages visitors to make them.

30. Unbeknownst to patients, and in direct contravention of Defendant's representations in its Cookie Banner, cookie settings popup, and Cookie Notice, Defendant transmits this sensitive and private health information to Third Parties—including AEC—in real time. The transmission occurs because Defendant has embedded Adobe's Third-Party Trackers and cookies in its website, which intercept visitors' communications with Defendant and simultaneously route the contents of those communications to Adobe. This sharing occurs even when the visitor has expressly declined non-strictly-necessary cookies by clicking "Reject" on the Cookie Banner, or by declining cookie categories and clicking "Save Settings" in the cookie settings popup. Before describing the specific Adobe Trackers and cookies that persist on Defendant's website despite visitors' opt-out, it is useful to understand how Trackers and cookies function generally.

## II. How Cookies and Trackers Surreptitiously Share Patients' Communications and Unique Identifiers with Third Parties.

31. Visiting a website involves a series of electronic communications between the visitor's browser and the website's servers. When a person visits a website like www.lilly.com, their browser initiates a series of web requests to Defendant's servers, requesting the webpage and associated resources. These are typically styled as HTTP "GET" requests. As the visitor's browser processes the webpage, additional requests may be triggered by scripts embedded within the webpage. These scripts are instructions sent by the webpage to the visitor's browser, which the visitor's browser then executes. A

visitor's interactions with a website may also involve HTTP "POST" requests. In a typical POST request, the visitor's browser sends information to the website's server.

32. By means of these requests, LillyDirect solicits and captures sensitive medical information from the patient visiting the website. For example, when a patient follows the on-site flow prompting them to research a specific medication or book a telehealth appointment for a particular medical condition, the Defendant's web server captures the information they shared with the website, including the medication they are researching or ordering, their selected dosage strength, their payment method, and the medical condition for which they seek telehealth care.

33. "Trackers" are one type of script that may be embedded within a webpage delivered in response to a "GET" request. Trackers instruct a visitor's browser to send information about the visitor's browsing activity to the tracker's developer. Tracked browsing information may include words typed, links clicked, time spent on each page, and buttons clicked by the visitor. This browsing information is typically accompanied by one or more data points that uniquely identify the visitor, such as their IP address or a "cookie."

34. "Cookies" are small text files sent by a website server to a visitor's browser and stored locally on the visitor's device. Typically, cookies contain a unique identifier tied to a specific visitor. When a visitor's browser sends an HTTP request to a website server, the request includes the cookie or cookies that allow the server to identify the visitor.

35. First-party Trackers and cookies are those developed and set by the web server with which the visitor is knowingly communicating. Here, first-party Trackers and cookies are those developed by Defendant and set by Defendant's website, www.lilly.com.

36. Third-Party Trackers and cookies are those developed and set by a Third-Party company or domain. Relevant Third-Party Trackers and cookies here include those developed by Adobe, which are embedded in Defendant's website. When a visitor's browser loads a webpage containing an embedded Third-Party Tracker, the Tracker—which is simply a script, i.e., lines of code—instructs the visitor's browser to determine whether that Third Party's cookie is already stored on the visitor's device. If not, the Tracker instructs the browser to store a new cookie uniquely associated with that visitor. If so, the Tracker instructs the browser to send the stored cookie to the Third Party's server, typically along with additional

information about the visitor's browsing activity. Because Third-Party cookies persist across multiple sessions and webpages, Third-Party cookies allow their developers to track specific individuals' browsing across websites and sessions.

37. Alternatively, a Third-Party Tracker like those from Adobe may use a different identifier, such as the patient's IP address. Like a cookie, an IP address enables third parties to track a specific patient's browsing across multiple websites and sessions.

38. Third-Party Trackers and cookies like those present on Defendant's website are generally invisible to the visitor, unless the visitor uses custom software designed to reveal Trackers and cookies.

39. When a visitor accesses a webpage containing Third-Party Trackers and cookies, the Trackers instantaneously intercept and duplicate communications sent between the visitor's browser and the website's server. Duplicated communications include the HTTP "GET" requests through which the visitor's browser requests the webpage and related resources, as well as the HTTP "POST" requests, which typically deliver information the visitor entered on the site, such as the specific medication they are researching or ordering, their selected dosage strength, whether they have a current prescription, the medical condition for which they are seeking telehealth care, and the telehealth provider with whom they seek to connect.

40. Thus, while it appears to the visitor that their browser is communicating only with the owner of a specific website, in fact their communications are intercepted and shared in real-time with undisclosed Third Parties.

41. Here, while visitors to www.lilly.com believe they are communicating only with Defendant, in fact their communications are intercepted and shared in real-time with Adobe via the Third-Party Trackers Defendant has embedded in its website.

42. Third-Party Trackers and cookies represent an invasion of privacy. When Third-Party Trackers and cookies are present on consumer-facing websites, information that consumers expect to remain private between themselves and the website's owner is surreptitiously intercepted and shared with undisclosed Third Parties.

43. Accordingly, many websites allow visitors to affirmatively opt-out of Third-Party Trackers and cookies. These opt-out tools are especially relevant where, as here, the website collects information

that is particularly sensitive and private, such as health information about specific medical conditions and the prescription medications patients are researching or purchasing. The ability to opt-out of Third-Party Tracking gives visitors comfort that they may safely share private and sensitive information with a specific company—here, their online pharmacy—without fear that the information will be shared more widely. Were it not for the ability to opt-out of Third-Party Tracking, many visitors would not be comfortable entering their healthcare and other information on the Internet.

44. Defendant purports to offer a tool by which website visitors may opt-out of Third-Party Trackers and cookies, in the form of a Cookie Banner that appears when the visitor first loads the webpage and persists until the user interacts with it.

**III. Defendant Falsely Promises that Patients May Opt-Out of Third-Party Cookies and Tracking.**

45. When a patient or prospective patient arrives on Defendant's LillyDirect website, Defendant displays a popup "Cookie Banner," which purports to allow the patient to opt-out of Third-Party tracking. The Cookie Banner is designed to give visitors comfort that their browsing activity, the medications they research and purchase, the conditions for which they seek telehealth treatment, and other sensitive health information they share with LillyDirect will not be transmitted to Third Parties without their consent. The Cookie Banner does not accurately reflect Defendant's actual data-sharing practices, as detailed below.




46. The Cookie Banner appears as an overlay displayed at the bottom of the screen, as shown above. It persists on every page unless and until the user interacts with it. The Cookie Banner states: "Lilly and our partners use optional cookies for analytics, personalization, and marketing. Some cookies may

process health information. Accept or Reject optional cookies." The banner offers two choices: an "Accept" button and a "Reject" button.

47. A "Manage Your Cookie Settings" cookie settings popup is available to users who click the "Cookie Settings" link embedded in the website's footer. When a patient clicks that link, the popup shown below appears. This popup organizes "tracking technologies and third-party cookies" into four categories: "Strictly Necessary," which "cannot be switched off in our systems," and three optional categories: "Functional," "Performance [or] Analytics", and "Advertising and Marketing." Visitors may toggle each optional category on or off and click "Save Settings" to apply their preferences. Alternatively, they may opt out of all three optional categories by clicking "Reject" on the Cookie Banner.




48. The cookie settings popup discloses two Adobe products whose tracking technologies are present on the website: "Adobe Experience Cloud" and "Adobe Target." Both are listed under "Advertising and Marketing." No Adobe products are listed in the "Strictly Necessary" category. The cookie settings popup characterizes both AEC and Adobe Target as "a collection of integrated online marketing and web

analytics products." Because Adobe tracking technologies do not appear among the Strictly Necessary Cookies that "cannot be switched off," patients are led to believe that clicking "Reject" on the Cookie Banner, or toggling off the Advertising and Marketing category and clicking "Save Settings" in the cookie settings popup, will prevent Adobe's tracking technologies from being installed on their browsers. As alleged in detail below, this promise is false.

49. Defendant's Cookie Notice confirms these representations, stating that "You can customize your consent preferences for cookies and other tracking technologies in the Lilly cookie consent solution. While strictly necessary cookies cannot be disabled, the cookie consent solution will record your choices for the use of performance, functional and marketing cookies that we use on our websites." The Cookie Notice goes on to admit that unless the user "Reject[s]" cookies, "[o]ur marketing partners (including third parties) use cookies to deliver relevant ads to you on different websites or social media platforms that you visit. These cookies collect personal information about you, such as unique digital identifiers, which pages you visit, actions you take on our website, and how you arrived at our website, all of which may be used to create a profile about you." As detailed below, the Cookie Notice is inaccurate. In fact, Defendant continues to collect this information and share it with Adobe (the Third Party) regardless of the user's consent or lack thereof.

50. Defendant's Privacy Statement further reveals the full scope of the data at stake. The Privacy Statement acknowledges that, through cookies and tracking technologies, Defendant collects "inferences about your health derived from the activities, usage information, and location information that we collect," and categorizes this as "Sensitive Personal Information," which the Privacy Statement defines to include "Information about your health (such as medical condition(s), diagnoses, or information that could result in an inferred health status)." The Privacy Statement further discloses that Defendant shares this sensitive health data with "[d]ata brokers (limited data, such as information related to your interactions with certain health related pages on our Digital Properties)." Buried within Defendant's supplemental U.S. state privacy disclosures, Defendant makes the following admission in capitalized text: "NOTICE: We may sell your Sensitive Personal Information."

51. Defendant's Cookie Banner, cookie settings popup, and privacy statement each create the illusion that Defendant is a responsible steward of visitors' private health information, and that patients

have meaningful control over whether the information they share with Defendant will in turn be shared with Third-Party marketers and analytics providers. These representations are false.

52. Even if a patient opts out of non-strictly-necessary cookies by clicking "Reject" on the Cookie Banner, or by toggling off non-strictly-necessary categories and clicking "Save Settings" in the cookie settings popup, AEM Trackers remain active on Defendant's website. AEC—which includes AEM—appears in the "Advertising and Marketing" category of Defendant's cookie settings popup. AEM Trackers and cookies do not appear among the "Strictly Necessary Cookies" that "cannot be switched off," nor do any tracking technologies from Adobe. Despite appearing in a category that visitors purportedly may opt out of, the AEM tracking technologies remain present on LillyDirect after opt-out, and continue to transmit visitors' browsing activity to Adobe's servers in real time, regardless of the visitor's stated preference.

53. AEM is Defendant's content management system and, as Defendant's own cookie settings popup acknowledges, part of "a collection of integrated online marketing and web analytics products." AEM collects detailed information about visitors' interactions with LillyDirect, including the specific medication pages they view, the telehealth services they investigate, and the unique identifiers that allow Adobe to link this browsing activity to a persistent individual profile across sessions and websites. On information and belief, Adobe uses the data it receives from Defendant's website to serve targeted advertisements to patients, including advertisements related to the specific prescription medications and sensitive health conditions the patients researched on LillyDirect.

54. Even after visitors click "Reject" on the Cookie Banner, or decline non-strictly-necessary cookie categories and click "Save Settings" in the cookie settings popup, Defendant's website continues to deploy Adobe's Trackers on visitors' browsers as they navigate LillyDirect. The Adobe Trackers that persist despite the visitor's opt-out include AEM Trackers that transmit to Adobe's servers the visitor's full page URL—which discloses the specific medication the visitor is viewing or the telehealth condition for which the visitor is seeking care—along with unique identifiers that allow Adobe to link that browsing event to the visitor's persistent profile.

55. For example, when a patient visits the LillyDirect pharmacy page for Basaglar (insulin glargine)—a prescription insulin product sold through LillyDirect—AEM transmits to Adobe's servers a

network request that includes the full page URL, disclosing that the visitor is viewing a specific medication. The request also includes an "affinity cookie" enabling Adobe to link this browsing event to the same visitor across sessions and websites. This transmission occurred even though the patient declined consent to "Advertising and Marketing" cookies and tracking technologies, including cookies and Trackers from Adobe.

56. Similarly, when a patient visits LillyDirect's telehealth section to seek care for obesity—one of many sensitive medical conditions from which the patient may choose—AEM transmits a network request to Adobe's servers that includes the full page URL, disclosing both that the visitor is seeking telehealth care and the specific medical condition for which they are seeking it. This transmission likewise occurred even though the patient had not consented to "Advertising and Marketing" cookies and tracking technologies, including cookies and Trackers from Adobe.

57. These transmissions occur in real time as the patient browses LillyDirect. They occur regardless of whether the visitor clicked "Reject" on the Cookie Banner or opted out of optional Trackers generally or "Advertising and Marketing" Trackers specifically in the cookie settings popup. Defendant's promise to honor patients' opt-out preferences is therefore false: the act of clicking "Reject" on the Cookie Banner or "Save Settings" on the cookie settings popup does not prevent Adobe from receiving detailed information about the patient's browsing activity, including the specific prescription medications they research and the sensitive health conditions for which they seek telehealth care on LillyDirect.

**IV. The Health Information Defendant Intercepted and Disclosed is Sensitive and Private.**

58. The information that Defendant's website transmits to AEM constitutes private, sensitive, and confidential health information. Specifically, the information Adobe receives includes: the name of the specific prescription medication the visitor researches, views, or orders through LillyDirect—which, as explained below, also reveals the medical condition for which that medication is prescribed—the specific condition for which the visitor seeks telehealth or in-person care through Defendant's Find Care feature; the fact that the visitor is researching, purchasing, or ordering prescription medication to treat a health condition, or is seeking a healthcare appointment; and unique identifiers—including IP addresses, session IDs, device identifiers, and persistent tracking cookies—that enable Adobe to link the disclosed health

information to a specific, identifiable individual across browsing sessions. Plaintiff refers herein to the customer information Defendant's website disclosed as the "Disclosed Information."

59. Each prescription drug available on LillyDirect is indicated for specific medical conditions. Because Adobe receives the full page URL every time a visitor views a drug's product page or places an order, a patient's use of the LillyDirect pharmacy directly and necessarily discloses the patient's medical condition. The prescription drugs currently available on LillyDirect—and the medical conditions they reveal—include: Zepbound, prescribed for PCOS, chronic weight management in adults with obesity or overweight, and for moderate-to-severe obstructive sleep apnea in adults with obesity; Mounjaro and Trulicity, each prescribed for the treatment of type 2 diabetes in adults; Basaglar, Humalog, Humulin, Lyumjev, and Rezvoglar, all prescribed for the management of type 1 or type 2 diabetes; and Emgality, prescribed for the prevention of migraine headaches. Obesity and type 2 diabetes—conditions readily inferred from a patient's use of Zepbound, Mounjaro, Trulicity, or the multiple insulin products available on LillyDirect—are among the most sensitive and stigmatized medical conditions in our society, often associated with shame, discrimination, and barriers to employment and insurance coverage.

60. Similarly, when patients use LillyDirect's Find Care feature to seek telehealth or in-person care, they disclose the specific condition for which they are seeking treatment by navigating to condition-specific pages whose URLs contain the condition name. For example, a patient directed to www.lilly.com/find-care/telehealth/obesity discloses through the URL alone that they are seeking treatment for obesity; a patient directed to www.lilly.com/find-care/telehealth/sleep-apnea discloses that they are seeking care for sleep apnea; and a patient directed to www.lilly.com/find-care/telehealth/diabetes discloses that they are seeking care for diabetes. The conditions for which LillyDirect offers dedicated care-finding support include obesity, type 2 diabetes, migraine, sleep apnea, Alzheimer's disease and memory and thinking concerns, alopecia, and eczema, among others. In each case, the patient's navigation to the condition-specific page constitutes a direct, URL-embedded disclosure of that patient's medical condition to Adobe.

61. In all of the foregoing examples, the information transmitted to Adobe includes not only the health condition or medication itself, but also unique identifiers—such as IP addresses, session IDs, device identifiers, and AEM's "affinity" cookie—that allow Adobe to persistently link the disclosed health

information to a specific individual across browsing sessions and across websites. The combination of a patient's medical condition with a persistent individual identifier creates a traceable health profile that enables Defendant and Adobe to identify, target, and profit from that individual's medical history.

62. Adobe's access to this information allows it to establish a particular individual's medical conditions and treatment-seeking behavior, build targeted advertising profiles, and profit from the disclosed health information. Defendant's unauthorized disclosure of patients' private health information engenders a variety of harmful consequences, including: potentially higher insurance rates if the patient's conditions become known to insurers or employers; risk of employment discrimination; risk of data breach and further dissemination of sensitive health data; and the social stigma arising from the unintended disclosure of sensitive conditions, including obesity and type 2 diabetes. Each of these conditions carries significant stigma in our society. Patients share information about these conditions with Defendant in confidence and with the reasonable expectation that it will not be transmitted to advertisers.

63. Information about a person's physical health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If patients cannot trust that their medical information will be kept private, they may be less likely to seek necessary medical treatment, which can lead to more serious health problems and, ultimately, worse health outcomes. These concerns are especially acute here, where Defendant's website is designed specifically to attract and serve patients seeking treatment for serious, chronic, and stigmatized medical conditions that they have a strong interest in keeping confidential.

## V. Defendant Profits from its Non-Consensual Disclosure of Patients' Private Health Information, as do the Third Parties to Whom Defendant Discloses that Information.

64. On information and belief, Defendant and the Third Parties with whom Defendant shares visitors' private health information derive profit from the Disclosed Information through one or more of the following mechanisms: (1) building individualized profiles about patients' interests, medical purchases, medical conditions, and treatment history for the purpose of selling products, delivering targeted advertising, or displaying a customized version of Defendant's website to visitors on subsequent visits;

(2) selling the Disclosed Information directly to data brokers and advertisers; and (3) refining advertising targeting algorithms by training them on the Disclosed Information.

65. Data harvesting is big business. As one court recently held, "[the Defendant] cannot seriously dispute that browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. As [the Plaintiff's expert] explained, there is an entire 'data industry' and estimates suggests that that industry 'now generates combined annual revenues of approximately $300 billion dollars.'" *Doe v. Virginia Mason Med. Ctr.*, No. 19-2-26674-1 SEA, 2024 WL 3517759 (Wash. Sup. Ct., June 6, 2024).

66. In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[7]

67. On information and belief, Defendant profits from its sharing of Disclosed Information by one or more of the following mechanisms.

68. First, Defendant earns sales revenue by more effectively advertising its own products on other websites. Defendant's online advertising efforts become more effective when they allow Third Parties to intercept patients' online communications and bundle this information with other information the platforms collected while the patient browsed other sites. If a patient navigates to Defendant's website to explore treatment for their sleep apnea, they might then see ads for Inspire's branded sleep apnea therapy on other websites or while consuming other electronic media. These "retargeting" ads are made possible because Defendant allowed the advertising platforms to silently observe what the patient did while on Defendant's website. Those advertising platforms can then serve Inspire ads to the same patients who visited Defendant's website.

69. Second, Defendant receives payments from Third Parties in exchange for those Third Parties' placement of Trackers and related cookies on the Defendant's website. Third Parties may pay

[7] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

Defendant to install their cookies and Trackers, because cookies and Trackers allow advertisers to serve ads that are customized to the patient's, identity, interests, and medical conditions.

70. Third, Defendant receives a service or services from the Third Parties either for free or at a discounted price. The service may be a technological tool embedded in the website, such as tools to improve functionality or to monitor website usage and performance.

71. Fourth, Defendant receives the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price.

72. Plaintiff anticipates learning the precise mechanism(s) by which Defendant profits from installation and deployment of the Trackers, including additional means by which Defendant profits from the technologies described herein, through discovery.

## VI. Defendant's Disclosure Violates Standards of Conduct in the HealthCare Industry.

73. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

74. Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), U.S. Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect private information like that Plaintiff and Class Members (defined below) communicated on Defendant's website.

75. In its guidance for Marketing, the Department instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or him protected health information can be made for marketing. … Simply put, **a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes**. Moreover, covered entities **may not sell**

> **lists of patients to third parties without obtaining authorization from each person on the list**. (Emphasis added). [8]

76. In December 2022, the Office for Civil Rights (OCR) at the HHS issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology (the "December 2022 Bulletin").[9]

77. Therein, HHS defined tracking technologies, explaining:

> Tracking technologies are used to collect and analyze information about how users interact with regulated entities' website or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[10]

78. In the December 2022 Bulletin, HHS stated that, "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, **disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**."[11]

79. Here, Defendant has not only failed to receive patients' "HIPAAA-complaint authorizations," is has ignored their express choice not to authorize disclosure via on Defendant's Cookie Banner.

---

[8] *Marketing*, U.S. Department of Health and Human Services, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[9] *See* archived version of the December 2022 Bulletin at HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

[10] *Id.*

[11] *Id. (emphasis added).* On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.*, Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," but acknowledged that the Proscribed Combination could be PHI in certain circumstances.

80. Likewise, the Federal Trade Commission ("FTC") agrees that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[12] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes." [13]

81. The FTC warns that violation of these rules may result in serious harm, highlighting precisely the condition- and treatment-related information at issue in this case:

> Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medical treatments, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.[14]

82. Thus, Defendant's conduct violates HIPAA Rules and engenders serious harms.

83. Defendant's disclosures also violate California's Consumer Privacy Act. *See* Cal. Civ. Code § 1798.100 *et seq*. Pursuant to that statute, "A business that sells or shares consumers' personal information, or that discloses consumers' personal information for a business purpose, shall disclose" that fact to the consumer. *Id.*, § 1798.115(c). Here, Defendant failed to provide an accurate disclosure, as required by California law. Defendant professed not to disclose any of Plaintiff's and Class Members' information via Third Party cookies and tracking technologies, while it in fact did so disclose, in contradiction to Defendant's express representations.

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

**Plaintiff Stephane Alvarez**

84. Plaintiff is a natural person and a resident of Orange, California (Orange County). Plaintiff suffers from PCOS (Polycystic Ovary Syndrome). Plaintiff used Defendant's LillyDirect website to research and purchase "Zepbound" and related supplies.

---

[12] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Federal Trade Commission (July 20, 2023), available at https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[13] *Id.*

[14] *Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services* (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited April 9, 2024).

85. When Plaintiff visited Defendant's LillyDirect website, Defendant presented her with the Cookie Banner. Consistent with her standard practice of declining cookies when offered the choice—which she follows across all of her devices and browsers—Plaintiff clicked "Reject" on Defendant's Cookie Banner.

86. Plaintiff is an active Facebook user. After Plaintiff visited Defendant's LillyDirect website, targeted advertisements for PCOS began appearing in her Facebook feed. These targeted advertisements are consistent with Defendant's unauthorized transmission of Plaintiff's private health information to Third Parties, including AEC, whose Trackers remained active on Defendant's website despite Plaintiff's having clicked "Reject" on the Cookie Banner.

87. Plaintiff reasonably expected that her online communications with Defendant were confidential, solely between herself and Defendant, and that those communications would not be transmitted to or intercepted by a Third Party.

88. Plaintiff provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's Cookie Banner, and the law. Plaintiff reasonably expected that her communications with Defendant were confidential, solely between Plaintiff and Defendant, and that any information she submitted to or generated through the LillyDirect website would not be transmitted to or intercepted by Third Parties.

89. Plaintiff never intended to sell the Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

90. On information and belief, through the use of cookies and Trackers, Defendant disclosed to Third Parties at least the following information, some of which Plaintiff Alvarez provided to Defendant in the course of ordering and researching prescription medications on LillyDirect:

a. the pages and content Plaintiff viewed on LillyDirect, including medication-specific product pages whose URLs disclosed the names of specific prescription medications and the specific dosages she viewed and/or purchased;

b. Plaintiff's ordering and/or researching of prescription medication for personal health conditions;

c. the name of the specific prescription medication Plaintiff ordered and/or researched, namely Zepbound, which was transmitted to Adobe in real time via the full page URL;

d. by logical extension, the medical condition(s) for which the prescription medication is indicated and for which Plaintiff is being treated (here, PCOS); and

e. additional identifying information unique to Plaintiff, including her IP address and unique identifying cookies set by Third Parties, which enable Third Parties to link the foregoing health information to a persistent individual profile associated with Plaintiff.

91. Plaintiff accessed Defendant's website at Defendant's direction and encouragement. Defendant markets LillyDirect as a convenient, confidential, direct-to-patient pharmacy platform that allows patients to research and purchase Lilly medications and to access telehealth services, and Plaintiff relied on those representations in using the website.

92. Plaintiff would not have shared her information with Defendant, or would have taken steps to prevent such sharing, if she had known that her private health information would be shared with Third Parties in violation of Defendant's representations and legal obligations.

93. As a result of Defendant's allowing and enabling Third Parties to intercept Plaintiff's Disclosed Information without authorization, Plaintiff was harmed in at least the following ways:

a. loss of privacy;

b. unauthorized disclosure of her patient status, medical conditions, and other Disclosed Information;

c. unauthorized access to her patient status, medical conditions, and other Disclosed Information by Third Parties;

d. Defendant benefited from its sharing of Plaintiff's patient status, medical conditions, and other Disclosed Information without sharing that benefit with Plaintiff;

e. lost benefit of her bargain with Defendant, as Plaintiff did not receive the reasonable privacy and data security protections she was promised;

f. Defendant and Third Parties enriched themselves at Plaintiff's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff's patient status, medical conditions, and other Disclosed Information without authorization;

g. Defendant profited from collecting and disclosing Plaintiff's Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff, which may include: (1) increased payments from the placement of ads on Defendant's website, (2) direct payments from Third Parties, (3) free or reduced-cost services, including services related to the implementation and monitoring of Defendant's website, (4) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price, and/or (5) increased efficacy and decreased costs of Defendant's own advertisements on other websites;

h. embarrassment, humiliation, frustration, and emotional distress;

i. decreased value of Plaintiff's Disclosed Information; and

j. increased risk of harm resulting from the use and disclosure of her patient status, medical conditions, and other Disclosed Information.

## TOLLING, CONCEALMENT, AND ESTOPPEL

94. The applicable statutes of limitation have been tolled because of Defendant's knowing and active concealment and denial of the facts alleged herein.

95. Defendant actively concealed its use of cookies and Trackers by providing an illusory opt-out function that did not, in fact, accomplish an opt-out. Defendant surreptitiously incorporated cookies and Trackers into its website while explicitly denying it was doing so to Plaintiff and members of the putative Class.

96. Plaintiff and putative Class Members could not have discovered Defendant's conduct, because Defendant actively concealed its conduct and mislead Plaintiff and putative Class Members via its deceptive Cookie Banner.

97. All applicable statutes of limitation have also been tolled by operation of the discovery rule as well as the doctrine of continuing tort. Defendant's illegal interception and disclosure of Plaintiff's and the Class's communications and Disclosed Information has continued unabated. Further, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

98. Plaintiff brings this statewide class action on behalf of herself and all other similarly situated pursuant to Cal. Civ. Proc. § 382.

99. Plaintiff seeks to represent the following class: "**all citizens of California who declined consent to optional cookies and other tracking technologies via Defendant's Cookie Banner and whose information was disclosed by Defendant to Third Parties.**"

100. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

101. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

102. The proposed Class is a well-defined community of interest, and this action satisfies the requirements for class certification found in the relevant case law.

103. Questions of law and fact common to the Class predominate over questions affecting only individual Class Members. Common questions include:

a. whether Defendant disclosed Class Members' communications or Disclosed Information to Third Parties;

b. whether Class Members consented to Defendant's disclosure of their communications or Disclosed Information;

c. whether Defendant owed duties to Plaintiff and Class Members to protect their communications or Disclosed Information;

d. whether Defendant breached its duty to protect Plaintiff's and Class Members' communications or Disclosed Information;

e. whether Defendant's disclosure of Plaintiff's and Class Members' communications or Disclosed Information to Third Parties violated laws, contracts, and industry standards;

f. whether Defendant's failure to allow patients a meaningful opportunity to opt out of sharing with Third Parties violated laws, contracts, and industry standards;

g. whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiff's and Class Members' communications or Disclosed Information;

h. whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiff's and Class Members' communications or Disclosed Information;

i. whether Defendant has a contractual obligation to protect Plaintiff's and Class Members' communications or Disclosed Information and whether it complied with such contractual obligation;

j. whether Defendant has a duty of confidence and whether it complied with such obligation; and

k. Whether, as a result of Defendant's conduct, Plaintiff and Class Members are entitled to injunctive, equitable, declaratory, monetary, statutory, and/or other relief, and, if so, the nature of such relief.

104. Plaintiff's claims are typical of those of other Class Members. Defendant installed cookies and Trackers on Plaintiff's browser and the browsers of absent Class Members despite Plaintiff and the Class Members expressly opting out of optional tracking technologies. Defendant intercepted and shared sensitive private information that Plaintiff and the Class Members provided to Defendant.

105. Plaintiff can adequately represent the proposed Class. She is prepared to serve as Class representatives, and her counsel are competent and experienced in matters of this type.

106. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that

experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

107. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

108. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

**COUNT 1**
**CALIFORNIA INVASION OF PRIVACY ACT**
**CAL PEN. CODE § 631**

109. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

110. The California Legislature enacted CIPA after finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

111. Cal. Pen. Code § 631 prohibits the following conduct by a defendant, if done "by means of any machine, instrument, contrivance, or in any other manner":

a. "Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," *or*

b. "Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any

message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state," *or*

c. "Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," *or*

d. "Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

112. Defendant engaged in all four of the above-listed forms of prohibited conduct.

113. Section 631(a) applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google Inc.*, No. C 06-05289 WHA, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

114. Defendant's website and the tracking technologies Defendant intentionally installed on it are prohibited by CIPA, as they constitute a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

115. By use of cookies and tracking technology, Defendant used a recording device to record the confidential communications in transit, including Disclosed Information, without the consent of Plaintiff or Class Members, and transmitted such information to Third Parties.

116. Defendant aided, agreed, and conspired with Third Parties to secretly record, use, intercept, and transmit the Disclosed Information.

117. The intercepting devices that Defendant employed or aided in the employment of include, but are not limited to:

a. the computers and servers to which Plaintiff's and Class Members' communications and information were disclosed;

b. Plaintiff's and Class Members' personal computing devices;

c. Plaintiff's and Class Members' web browsers;

d. Plaintiff's and Class Members' browser-managed files;

e. cookies;

f. other pixels, trackers, and/or tracking technology installed on Defendant's website and/or server, or on Plaintiff's and Class Members' browsers;

g. Defendant's computer servers;

h. Third Party source code used by Defendant; and

i. Third Party computer servers.

118. The relevant trackers and cookies transmitted each of a website consumers' actions to Third Parties alongside and contemporaneously with the consumer initiating the communication. Thus, Plaintiff's and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

119. Defendant willingly facilitated the Third Parties' interception and collection of Plaintiff's and Class Members' communications or Disclosed Information, and the Third Parties' use of their communications or Disclosed Information, by embedding the Trackers and cookies on its website. Moreover, Defendant had full control over these Trackers and cookies, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

120. Defendant gave substantial assistance to the Third Parties in violating the privacy rights of Defendant's customers and other consumers, even though Defendant's conduct constituted a breach of the duties that it owed, including the duty healthcare providers owe to their patients. Defendant knew that the installation of the Trackers and cookies on its website would result in the unauthorized disclosure of customers' communications to Third Parties.

121. Defendant assisted Third Parties in reading, learning, and exploiting the Disclosed Information. Defendant disclosed details about website visitors to Third Parties, as described above.

122. Plaintiff and the Class Members seek statutory damages under Cal. Pen. Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages

sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT 2**
**CALIFORNIA INVASION OF PRIVACY ACT**
**CAL PEN. CODE § 632**

123. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

124. CIPA § 632(a) prohibits "intentionally and without the consent of all parties to a confidential communication, us[ing a] recording device to eavesdrop upon or record the confidential communication."

125. By installing and facilitating deployment of cookies and Trackers despite Class Members' explicit instructions not to, Defendant used a recording device to record confidential communications, including the Disclosed Information described above.

126. Defendant also aided and assisted Third Parties to eavesdrop and wiretap Plaintiff's and Class Members' communications in violation of Section 632 by facilitating, permitting, and endorsing their use of Trackers and cookies to surreptitiously record and read communications between Class Members and Defendant.

127. The recording devices used by Defendant include, but are not limited to, the devices described in Count 1 above.

128. Plaintiff and the Class Members seek statutory damages under Cal. Pen. Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT 3**
**CALIFORNIA INVASION OF PRIVACY ACT**
**CAL. PEN. CODE § 638.51 *ET SEQ***

129. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

130. Section 638.51 of CIPA prohibits the installation or use of "a pen register or trap and trace device without first obtaining a court order." Cal. Pen. Code § 638.51(a).

131. Defendant repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from consumers. Defendant's continued use of Trackers after a consumer opted out, as described in detail above, demonstrates that no valid consent was obtained. Instead, Defendant relied on a knowingly deceptive interface that falsely conveyed consumer control while continuing to intercept and transmit private communications.

132. An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal. Pen. Code § 629.51(a)(2).

133. All communications between Plaintiff or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (*e.g.*, computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

134. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

135. Trackers and cookies are "pen registers" under Section 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of visitors to Defendant's website. Cal. Pen. Code § 638.50(b).

136. California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

137. The Trackers are also "trap and trace devices" under Section 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or

signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Pen. Code § 638.50(c).

138. Defendant installed the Trackers on its website and used them to capture and transmit addressing information, including Plaintiff's and Class Members' IP addresses and other unique identifiers to Third Parties.

139. Plaintiff and Class Members did not provide their consent prior to Defendant's installation and use of the trackers and cookies. On information and belief, Defendant also did not obtain a court order to install or use the Trackers and cookies.

140. Under California Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of California Penal Code § 638.51(a), and each seek statutory damages of $5,000 per violation.

141. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT 4**
**BREACH OF CONTRACT**

142. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

143. Defendant's representations to Plaintiff and Class Members regarding its use of cookies and tracking technology, including the representations in its Cookie Banner, constitute a contract. By declining consent to optional tracking technologies, Plaintiff and the Class Members indicated their acceptance of Defendant's express offer not to employ cookie and tracking technologies while they navigated Defendant's website. In consideration for Defendant's promise, Plaintiff and the Class Members continued to use Defendant's website and products, in reliance on the representations Defendant made in its Cookie Banner.

144. Plaintiff and Class Members would not have used Defendant's website or provided their personal information to Defendant, including Disclosed Information, in the absence of the contract binding them and Defendant. Defendant's promised safeguarding of the Disclosed Information was critical to realize the intent of the parties.

145. As detailed above, Defendant breached its contracts with Plaintiff and Class Members by disclosing their information Third Parties in direct contravention of the Cookie Banner.

146. As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above.

**COUNT 5**
**CALIFORNIA UNFAIR COMPETITION LAW ("UCL"),**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***

147. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

148. The California Business and Professions Code § 17201, *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

149. Defendant's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et. seq*. (the "UCL") because, as alleged above, Defendant violated California common law, HIPAA, the California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq.*, and the other laws and causes of action alleged herein.

150. When using Defendant's website and services, Plaintiff and Class Members relied on Defendant's status as a trusted healthcare institution and the representations in its Cookie Banner.

151. Inconsistent with its representations and role, Defendant disclosed Plaintiff's and Class Members' Disclosed Information to Third Parties without their consent. Thus, Defendant represented that its services have characteristics, uses, or benefits that they do not have and represented that its services are of a particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

152. Had Plaintiff and Class Members known that Defendant would intercept, collect, and transmit their communications or Disclosed Information to Third Parties, Plaintiff and the Class Members would not have used Defendant's services.

153. Plaintiff and Class Members have a property interest in their communications or Disclosed Information. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' communications or Disclosed Information, Defendant has taken property from Plaintiff and Class Members without providing just (or indeed any) compensation.

154. By deceptively collecting, using, and sharing Plaintiff's and Class Members' communications or Disclosed Information with Third Parties for Third Party use, Defendant has taken money or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of herself and the Class.

155. Defendant's business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

156. Plaintiff and Class Members have lost money and property due to Defendant's conduct in violation of the UCL. Disclosed Information such as that which Defendant collected and transmitted to Third Parties has objective monetary value. Companies are willing to pay for such Disclosed Information, like the information Defendant unlawfully collected and transmitted to Third Parties.

157. By deceptively collecting, using, and sharing Plaintiff's and Class Members' communications or Disclosed Information with Third Parties, and by allowing Third Parties to use their Disclosed Information, Defendant has taken money and/or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of herself and the Class.

158. As a direct and proximate result of Defendant's unfair and unlawful methods and practices of competition, Plaintiff and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Disclosed Information.

159. As a direct and proximate result of its unfair and unlawful business practices, Defendant has each been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to Section 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all other similarly situated, requests judgment in her favor and the following relief:

a. for an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

b. for an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

c. for an award of punitive damages, as allowable by law;

d. for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Disclosed Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

e. for an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its customers to secure their Disclosed Information and that Defendant violates this legal duty by disclosing its customers and website visitors' Disclosed Information to unaffiliated Third Parties;

f. for equitable relief compelling Defendant to adopt appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of communications or Disclosed Information compromised and unlawfully disclosed to Third Parties;

g. for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

h. for an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law, including attorney's fees under Cal. Code Civ. Proc. § 1021.5;

i. costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

j. pre- and post-judgment interest on any amounts awarded; and

k. such other and further relief as this court may deem just and proper.

/ / /

/ / /

**JURY TRIAL DEMANDED**

Plaintiff further demands a trial by jury on all issues so triable.

Dated: July 20, 2026

**LYNCH CARPENTER, LLP**

By: */s/ (Eddie) Jae K. Kim*
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Telephone: (619) 762-1910
Facsimile: (858) 313-1850

*Attorneys for Plaintiff and Proposed Class Counsel*

# EXHIBIT B

Electronically Filed by Superior Court of California, County of Orange, 07/20/2026 01:52:12 PM.
30-2026-01584904-CU-BT-CXC - ROA # 4 - DAVID H. YAMASAKI, Clerk of the Court By S. Juarez, Deputy Clerk.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
***(SOLO PARA USO DE LA CORTE)***

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
ELI LILLY AND COMPANY,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
STEPHANIE ALVAREZ, individually and on behalf of all others similarly situated,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of Orange
751 West Santa Ana Blvd, Santa Ana, CA 92701

CASE NUMBER: *(Número del Caso):* 30-2026-01584904-CU-BT-CXC
Judge David A. Hoffer

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
LYNCH CARPENTER, LLP: (Eddie) Jae K. Kim & Tiffine E. Malamphy, 9171 Towne Centre Dr, Ste 180, San Diego, CA 92122,

DATE: *(Fecha)* 07/20/2026 DAVID H. YAMASAKI, Clerk of the Court Clerk, by *(Secretario)* S. Juarez S. Juarez, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*:

**PROOF OF SERVICE BY U.S. MAIL**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Davis Wright Tremaine LLP, 350 S. Grand Ave., 27th Floor, Los Angeles, California 90071.

On August 24, 2026, I served the foregoing document(s) described as: **DEFENDANT'S NOTICE OF REMOVAL** by forwarding a portable document file to the electronic mail address(es) below and by placing a **true copy** of said document(s) enclosed in a sealed envelope(s) for each addressee named below, with the name and address of the person served shown on the envelope as follows:

(Eddie) Jae K. Kim
Tiffine E. Malamphy
LYNCH CARPENTER, LLP
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
*Counsel for Plaintiff*

**(U.S. MAIL)** - I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP for collecting and processing correspondence for mailing with the United States Postal Service. I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP personnel responsible for delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

Executed on August 24, 2026, at Los Angeles, California.

☒ Federal I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

| Lina Pearmain | */s/ Lina Pearmain* |
|---|---|
| Print Name | Signature |



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., SUITE 2700
LOS ANGELES, CALIFORNIA 90071-3487
(213) 633-6800
FAX: (213) 633-6899

Electronically Filed by Superior Court of California, County of Orange, 07/20/2026 01:52:12 PM.
30-2026-01584904-CU-BT-CXC - ROA # 3 - DAVID H. YAMASAKI, Clerk of the Court By S. Juarez, Deputy Clerk.

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
(Eddie) Jae K. Kim (SBN 236805); Tiffine E. Malamphy (SBN 312239)
LYNCH CARPENTER, LLP, 9171 Towne Centre Drive, Suite 180, San Diego, CA 92122

TELEPHONE NO.: (619) 762-1910 FAX NO.: (858) 313-1850
EMAIL ADDRESS: ekim@lcllp.com; tiffine@lcllp.com
ATTORNEY FOR *(Name):* Plaintiff Stephanie Alvarez

*FOR COURT USE ONLY*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
STREET ADDRESS: 751 West Santa Ana Blvd
MAILING ADDRESS: 751 West Santa Ana Blvd
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Civil Complex Center

CASE NAME:
Alvarez vs. Eli Lilly and Company

## CIVIL CASE COVER SHEET

[x] **Unlimited** (Amount demanded exceeds $35,000)
[ ] **Limited** (Amount demanded is $35,000 or less)

**Complex Case Designation**
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 30-2026-01584904-CU-BT-CXC
JUDGE: Judge David A. Hoffer
DEPT.: CX103

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* 5: Pen. Code §§631, 631, & 638.51, Breach of Contract, Bus. & Prof. Code § 17200 et seq.
5. This case [x] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 20, 2026
(Eddie) Jae K. Kim — (TYPE OR PRINT NAME)
*/s/ (Eddie) Jae K. Kim* — (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

Electronically Filed by Superior Court of California, County of Orange, 07/27/2026 08:00:00 AM
30-2026-01584904-CU-BT-CXC - ROA # 8 - DAVID H. YAMASAKI, Clerk of the Court By eClerk, Deputy Clerk.

| *Attorney or Party without Attorney:* Jae K. Kim, Esq., Bar #236805<br>Lynch Carpenter LLP<br>9171 Towne Center Drive, Suite 180<br>San Diego, CA 92122<br>*Telephone No:* 619-762-1910<br>*Attorney for:* Plaintiff(s) | *Ref. No. or File No.:* | | | *For Court Use Only* |
|---|---|---|---|---|
| *Insert name of Court, and Judicial District and Branch Court:* Orange County Superior Court | | | | |
| *Plaintiff(s):* Stephanie Alvarez, Individually And On Behalf Of Of All Others Similarly Situated<br>*Defendant:* Eli Lilly and Company | | | | |
| **PROOF OF SERVICE**<br>**Summons Complaint** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:* 30202601584904 |

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Complaint; Civil Case Cover Sheet

3. *a. Party served:* Eli Lilly and Company
   *b. Person served:* Diana Ruiz, Authorized Agent, Hispanic, Female, 28 Years Old, Brown Hair, Brown Eyes, 5 Feet 2 Inches, 150 Pounds

4. *Address where the party was served:* National Registered Agents
   330 N. Brand Blvd.
   Suite 700
   Glendale, CA 91203

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu., Jul. 23, 2026 (2) at: 12:15PM

6. *The "Notice to the Person Served" (on the Summons) was completed as follows:*
   *on behalf of:* Eli Lilly and Company
   Under CCP 416.10 (corporation)

7. ***Person Who Served Papers:***
   a. Grach Adjimikrian
   **b. Class Action Research & Litigation**
   P O Box 740
   Penryn, CA 95663
   c. (916) 663-2562, FAX (916) 663-4955

   Recoverable Cost Per CCP 1033.5(a)(4)(B)
   d. ***The Fee** for Service was:* $151.30
   e. I am: (3) registered California process server
   *(i)* Independent Contractor
   *(ii) Registration No.:* 2022226377
   *(iii) County:* Los Angeles

8. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

***Date: Thu, Jul. 23, 2026***

**(Grach Adjimikrian)**

Case Summary:

| | |
|---|---|
| Case Id: | 30-2026-01584904-CU-BT-CXC |
| Case Title: | STEPHANIE ALVAREZ VS. ELI LILLY AND COMPANY |
| Case Type: | BUSINESS TORT |
| Filing Date: | 07/20/2026 |
| Category: | CIVIL - UNLIMITED |

Register Of Actions:

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 1 | E-FILING TRANSACTION 11715099 RECEIVED ON 07/20/2026 01:52:12 PM. | 07/22/2026 | | *NV* | |
| 2 | COMPLAINT FILED BY ALVAREZ, STEPHANIE ON 07/20/2026 | 07/20/2026 | | 39 pages | ☐ |
| 3 | CIVIL CASE COVER SHEET FILED BY ALVAREZ, STEPHANIE ON 07/20/2026 | 07/20/2026 | | 2 pages | ☐ |
| 4 | SUMMONS ISSUED AND FILED FILED BY ALVAREZ, STEPHANIE ON 07/20/2026 | 07/20/2026 | | 1 pages | ☐ |
| 5 | PAYMENT RECEIVED BY ONELEGAL FOR 194 - COMPLAINT OR OTHER 1ST PAPER, 34 - COMPLEX CASE FEE - PLAINTIFF IN THE AMOUNT OF 1,435.00, TRANSACTION NUMBER 13865350 AND RECEIPT NUMBER 13693610. | 07/22/2026 | | 1 pages | ☐ |
| 6 | CASE ASSIGNED TO JUDICIAL OFFICER HOFFER, DAVID ON 07/20/2026. | 07/20/2026 | | *NV* | |
| 7 | E-FILING TRANSACTION 42070931 RECEIVED ON 07/27/2026 06:34:45 AM. | 07/27/2026 | | *NV* | |
| 8 | PROOF OF SERVICE OF 30-DAY SUMMONS & COMPLAINT - PERSONAL FILED BY ALVAREZ, STEPHANIE ON 07/27/2026 | 07/27/2026 | | 1 pages | ☐ |

Participants:

| Name | Type | Assoc | Start Date | End Date |
|---|---|---|---|---|
| ELI LILLY AND COMPANY | DEFENDANT | | 07/22/2026 | |
| STEPHANIE ALVAREZ | PLAINTIFF | | 07/22/2026 | |
| LYNCH CARPENTER, LLP | ATTORNEY | | 07/22/2026 | |

Hearings:

| Description | Date | Time | Department | Judge |
|---|---|---|---|---|

Print this page